UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **RICHARD WILKINSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No. 1:12-cv-1308-WTL-MJD** |
| | ) | |
| **CAROLYN COLVIN, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Richard Wilkinson requests judicial review of the final decision of Defendant

Carolyn Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"),

denying his application for Disability Insurance Benefits ("DIB") and Supplemental Insurance

Benefits ("SSI") under Titles II and XVI of the Social Security Act ("the Act"). The Court rules as

follows.

## I. PROCEDURAL HISTORY

Wilkinson filed for SSI and DIB on June 10, 2011, alleging that he became disabled on

September 15, 2010, primarily due to back pain, obesity, coronary artery disease, depression, and

substance abuse. Wilkinson's applications were denied initially on September 6, 2011, and again

on reconsideration on November 15, 2011. Following the denial on reconsideration, Wilkinson

requested and received a hearing in front of an Administrative Law Judge ("ALJ"). A hearing,

during which Wilkinson was represented by counsel, was held by ALJ Ronald Jordan on April 24,

---

[1] Carolyn Colvin became Acting Commissioner of the Social Security Administration after this case was filed. She is therefore substituted as the Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

1

2012. A vocational expert testified at the hearing. ALJ Jordan issued his decision denying

Wilkinson's application on May 21, 2012. The Appeals Council affirmed the ALJ's decision on

July 27, 2012, after which Wilkinson filed this appeal.

## II. APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason

of a medically determinable mental or physical impairment which can be expected to result in

death, or which has lasted or can be expected to last for a continuous period of at least twelve

months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate

that his physical or mental limitations prevent him from doing not only his previous work, but any

other kind of gainful employment that exists in the national economy, considering his age,

education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step

sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is not

disabled, despite his medical condition and other factors. 20 C.F.R. § 404.1520(b).[2] At step two, if

the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to

perform basic work activities), he is not disabled. 20 C.F.R. § 404.1520(c). At step three, the

Commissioner determines whether the claimant's impairment or combination of impairments

meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt.

404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement;

if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able

to perform his past relevant work, he is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the

---

[2] The Code of Federal Regulations contains separate sections relating to DIB and SSI that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to DIB sections only.

claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 404.1520(g).

On review of the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into his reasoning . . . [and] build an accurate and logical bridge from the evidence to his conclusion." *Id.*

### III. <u>MEDICAL EVIDENCE</u>

Wilkinson suffers from heart disease, depression, and substance abuse. The errors alleged by Wilkinson pertain to his mental impairments only; therefore the Court includes below only the medical evidence relating to that impairment.

#### A.      Psychiatric Treatment

Wilkinson attempted suicide on July 6, 2009, and received treatment at Reid Hospital. An argument with his 16-year-old daughter prompted Wilkinson's suicide attempt. Wilkinson

3

ingested 48 ephedrine pills, drank one-half a fifth of vodka, and superficially lacerated his left wrist with a box cutter. Reid Hospital admitted Wilkinson and assigned him a GAF score of 50. The hospital discharged Wilkinson on July 10, 2013, with a GAF of 60. Wilkinson reported purchasing and ingesting 6 to 80 tablets of ephedrine weekly, and using other downers, opiates, and alcohol. He reported that his substance abuse problem began at age 19 or 20.

A July 13, 2009, follow-up examination revealed that although Wilkinson was "still a bit depressed," he was "in no distress." On July 14, 2009, Wilkinson was evaluated at Dunn Mental Health Center, Inc. He reported battling depression since 1988; he had taken Prozac until six years prior when his therapist left and he could not afford to continue treatment.

On April 16, 2011, Wilkinson was examined at Reid Hospital for headaches and chest pain. Although Wilkinson reported a history of depression, no psychosis, anxiety, or depression was noted on exam.

On May 17, 2011, Wilkinson was drinking heavily in a store parking lot and cut his wrists. He went inside the store and employees called the police; Wilkinson was thereafter admitted to Reid Hospital. Wilkinson explained that he was desperate due to financial problems, his inability to find a job, and guilt related to not being able to provide for his family. Wilkinson reported previous psychotic hospitalizations, the first one being close to ten years ago; each hospitalization lasted three to six days. He reported previously taking Effexor and Paxil, but he could not afford to continue taking these medications. On examination of his mental status, Dr. Mehtab Khan noted that Wilkinson continued to have thoughts of suicide using a knife. Dr. Khan found his judgment capacity limited and opined that Wilkinson had "very poor insight into his illness." Wilkinson's GAF at intake was 35.   Doctors at Reid Hospital diagnosed him with major recurrent depression and alcohol dependence, treated him with mood stabilizers, and discharged him on May 29, 2011.

4

On discharge, Wilkinson's doctors assigned him a GAF of 40. On a subsequent admission in August 2011, doctors reflected that, after discharge in May 2011, Wilkinson was "doing reasonably well with a combination of Wellbutrin, Seroquel, and Prozac."

On May 31, 2011, Wilkinson's GAF was 45 and his mood disorder was attributed to being laid off and unable to provide for his family.

On June 17, 2011, Wilkinson underwent a formal mental status exam at Meridian Mental Health Clinic. At this exam, he was noted as oriented with coherent, rational, and goal-directed speech, and he displayed good insight and fair judgment. However, his examiner noted that he had a "slovenly appearance" and poor eye contact. Wilkinson described himself as still depressed with suicidal thoughts, but no plan. The examiner diagnosed him with major depression and assigned a GAF of 40.

On July 15, 2011, Wilkinson reported that his depression and anxiety persisted and he attributed these feelings to his inability to find employment.

At an August 2, 2011, appointment at Meridian Mental Health Clinic, Wilkinson reported feeling hopeless and highly stressed financially, but he reported not feeling suicidal.

However, Wilkinson was admitted to Reid Hospital on August 10, 2011, for complaints of depression and suicidal ideation. At the time, he made comments that life was not worth living for. He reported not being able to afford some of his psychiatric medications, though he continued to take Prozac, BuSpar, and Topamax. He indicated that he did not believe his depression was under control even when he was on medication. Doctors at Reid Hospital described this two-day admission as "uneventful" in comparison to the May 2011 admission, when Wilkinson had been melodramatic, hysterical, and had made suicidal threats on a regular basis. In contrast, during this admission, Wilkinson was described as reasonable, calm, and cooperative. On discharge, doctors

5

at Reid Hospital diagnosed depression and an unspecified personality disorder, and assigned a GAF of 50.

Wilkinson resumed outpatient counseling at Meridian Services on August 22, 2011. On exam, Wilkinson was alert and oriented and displayed normal mood, affect, and speech. His thoughts were organized and logical and he displayed fair insight and good judgment.

On August 31, 2011, Wilkinson underwent a psychological examination for the Social Security Administration by psychologist Regina McKinney. During the exam, Wilkinson described himself as constantly anxious and depressed but reported currently receiving psychiatric and counseling services. McKinney found his grooming and hygiene adequate but she noted that he appeared to be depressed during the evaluation. Wilkinson was cooperative and did not appear to exaggerate or minimize his difficulties. McKinney rated him of low-average intelligence. McKinney found recurrent major depressive disorder and problems interacting with the social environment. Wilkinson was assessed with a GAF of 50, indicating "serious symptomatology." She also concluded that, "should he be granted disability compensation, he may have difficulty managing funds prudently given his limited arithmetic skills."

On September 6, 2011, Dr. Benetta Johnson reviewed Wilkinson's medical records and completed a Psychiatric Review Technique form. Dr. Johnson opined that Wilkinson's mental impairments caused marked levels of limitations and satisfied Listing 12.09, Substance Addiction Disorders, for which his drug and alcohol abuse was material. With respect to his limitations under Listing 12.04 for Affective Disorders and 12.09 for Substance Addiction Disorders, Dr. Johnson rated Wilkinson as markedly limited in activities of daily living and maintaining concentration, persistence, or pace, and moderately limited in maintaining social functioning. On November 15, 2011, Dr. William Shipley affirmed Dr. Johnson's opinion.

6

Wilkinson next presented to Meridian Services on October 4, 2011. His mental status exam indicated organized and logical thoughts, but poor-to-fair insight and fair judgment. Wilkinson did not have any hallucinations or delusions.

On November 9, 2011, Wilkinson was again admitted to Reid Hospital with complaints of suicidal ideations lasting about a week. He had gone to see his counselor and was found with a blade in his pocket, which was confiscated. He admitted to thinking of cutting himself and stated that there was a "good chance" that he would hurt himself if he were released from the hospital. During his three-day admission, Wilkinson was observed as calm, pleasant, and cooperative, and he "fit right in" with group therapy. The morning after his admission, Wilkinson did not appear to be depressed or anxious and his doctor commented that Wilkinson appeared to enjoy being an inpatient. His doctors described the admission as "brief and reasonably uneventful." On discharge, Wilkinson's doctor diagnosed him with depression, but ruled out major depression. Wilkinson was assigned a GAF of 50.

On November 15, 2011, Wilkinson was seen by Meridian Services. At that time, he denied having suicidal or homicidal ideations, although he described vision disturbances.

On January 3, 2012, Wilkinson was seen at Reid Hospital with complaints of chest pain. He was assessed as psychiatrically "normal." On January 19, 2012, Wilkinson was seen at Richmond Cardiology Associates for recent fainting episodes. He was noted to display appropriate mood and full orientation to time, person, and place. Similarly, on January 20, 2012, Dr. Michael Smith at Reid Hospital noted no evidence of psychosis or depression. However, on January 21, 2012, Wilkinson received psychotherapy at Meridian Services and it was noted that he was disheveled in appearance and gave off a foul odor. Wilkinson was unable to sustain eye contact and his mood was depressed and his affect constricted.

7

On March 11, 2012, Wilkinson was seen at Meridian Services. His diagnosis was noted as recurrent major depression with a GAF of 40. He reported low energy/fatigue, difficulty concentrating, and poor sleep. He also reported hearing voices that challenged him to kill himself. Wilkinson was alert, although it was noted that he had more difficulty with concentration.

On April 11, 2012, Dr. Snieguole Radzeviciene completed a residual functional capacity assessment. Dr. Radziviciene indicated that Wilkinson's diagnoses were major depression, recurrent, moderate, and substance abuse/dependence (alcohol and pain pills). The doctor explained that Wilkinson had specific restrictions on his work activities due to headaches/dizziness; back issues; difficulty with concentration/memory and staying on specific tasks; and low motivation/energy and fatigue due to depression. Wilkinson was rated as having "marked limitations" in the ability to remember locations and work-like procedures and understand and remember detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors and respond appropriately to changes in the work setting.

## B.     Hearing Testimony

At the hearing, Wilkinson testified that his inability to obtain employment was causing his severe depression. He felt guilty that he was not able to provide for his family. Wilkinson is married and has three step-children. His wife and a stepson are also disabled. Wilkinson has not

8

been able to work since 1997. He has not had any problems with drug or alcohol abuse since 1998. He now drinks alcohol only when he is about to commit suicide, which he has attempted six or seven times. He sometimes hears voices telling him to hurt himself or kill himself. Some of his suicide attempts were precipitated by these voices.

Wilkinson testified that he does not have any friends, as he isolates himself to avoid using drugs and alcohol. Instead, he spends time with his wife and kids.

Wilkinson also testified to problems with concentration and memory. For example, he would forget what he was talking about when he had a conversation with someone. When watching a thirty minute television show, he forgets what the show is about. He stays in bed four days a week and is absent from work on those days.

When Wilkinson was working for the city parks department, he missed work due to severe headaches. In a six-month period, he was absent 23 days.

## IV. <u>THE ALJ'S DECISION</u>

Applying the five-step analysis, the ALJ found that Wilkinson was not disabled from September 15, 2010, through the date of his decision on May 21, 2012. At step one of the analysis, the ALJ found that Wilkinson had not engaged in any substantial gainful activity since September 15, 2010, the alleged onset date of his disability. At step two, the ALJ determined that Wilkinson suffered from the following severe impairments: disorders of the spine, obesity, coronary artery disease, depression, alcohol dependence, and opioid dependence. The ALJ further found that Wilkinson's atrial fibrillation and headaches were not severe. At step three of the analysis, the ALJ determined that none of Wilkinson's impairments met or medically equaled a listed impairment.

At step four, the ALJ concluded that Wilkinson retained the residual functional capacity ("RFC") to perform a range of light work described as follows. Wilkinson can lift, carry, push, or

9

pull twenty pounds occasionally and ten pounds frequently; stand/or walk six hours in an

eight-hour workday; sit six hours in an eight-hour workday; balance, stoop, crouch, crawl, kneel,

and climb ramps or stairs occasionally; never climb ladders, ropes, or scaffolds; and never work

around hazards such as unprotected heights or unguarded, dangerous moving machinery. The ALJ

further found that Wilkinson had the mental capacity to perform simple and repetitive tasks,

requiring no independent judgment regarding work processes, with work goals that are static and

predictable.

The ALJ next concluded that, given Wilkinson's RFC, he was not able to perform any of

his past relevant work as a landscape specialist (park maintenance), meat cutter, hotel maintenance

worker, nursing home cleaner, or packer. However, considering his age, education, work

experience, and RFC, the ALJ found that Wilkinson was capable of performing other work that

exists in significant numbers in the regional economy, including representative occupations such

as apparel sorter, packing line worker, and housekeeper. Therefore, the ALJ determined at step

five that Wilkinson was not disabled.

## V. DISCUSSION

Wilkinson advances several objections to the ALJ's decision, each is addressed below.

### A. Lack of Substantial Evidence to Support the ALJ's Decision

Wilkinson argues that substantial evidence fails to support the ALJ's determination that

Wilkinson's combined mental impairments did not meet or medically equal Listing 12.04.[3]

Wilkinson also argues that the ALJ's decision is "illogical" because he stressed Wilkinson's abuse

---

[3] Listing 12.09 for substance addiction disorders requires "behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system" and provides that "[t]he required level of severity for these disorders is met when the requirements" of any of several other listings, including Listing 12.04, are satisfied.

of alcohol and drugs as a factor in determining whether Wilkinson was disabled by his depression, while at the same time the ALJ found that Wilkinson's alcohol and drug abuse did not meet the listing for substance abuse.

While the Court finds nothing inherently illogical in the ALJ's treatment of Wilkinson's apparent substance abuse problems – Wilkinson's alcohol and drug abuse may be considered by the ALJ even if it does not meet or medically equal a listed impairment – the ALJ's analysis of Wilkinson's impairments under the listings is in error. The ALJ begins his analysis by stating that "[n]o treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment" and the State Agency medical consultants "reached the same conclusion." R. at 16. With regard to Wilkinson's mental impairments, the ALJ specifically finds that the "paragraph B" criteria are not satisfied. Paragraph B requires that an impairment resulting in at least two of the following: (1) Marked restriction of activities of daily living; (2) Marked difficulties in maintaining social functioning; (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration. However, although not a treating or examining physician, Dr. Johnson conducted a September 2011 psychiatric review technique form in which she specifically found that Wilkinson met Listing 12.09 and also referred to Listing 12.04 when she found that he had "marked" limitations in activities of daily living and maintaining concentration, persistence, or pace. This opinion was affirmed by Dr. Shipley in November 2011. Yet in his decision, the ALJ does not even acknowledge these records, much less assess their impact on his analysis. In the absence of discussion of these records, the ALJ fails to build an accurate and logical bridge from the evidence of record to his conclusion.

The Court also notes that Wilkinson argues that there is evidence in the record meeting the

11

requirements of subpart A for listing 12.04. As the ALJ found the criteria for subpart B not met, he

did not analyze subpart A. On remand, if the ALJ assesses the subpart B criteria and finds its

requirements met, he should address the evidence of record as to subpart A.

Finally, the Court notes that it does not agree with Wilkinson's assertion of error inasmuch

as the ALJ is alleged to have "arbitrarily rejected" the GAF scores in the record. As an initial

matter, the ALJ considered Wilkinson's GAF scores and explained the weight he gave those

scores. For example, one score "was assigned during a period of decompensation and, was not a

true reflection of [Wilkinson's] overall level of functioning." R at 23. The ALJ's consideration of

these scores was therefore not "arbitrary." In addition, the ALJ noted that "GAF scores are but one

factor to consider in the adjudication of a case and are not controlling – the longitudinal evaluation

of the case is critical." R. at 24. Indeed, "nowhere do the Social Security regulations or case law

require an ALJ to determine the extent of an individual's disability based entirely on his GAF

score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

### B. Failure to Summon a Medical Expert (Psychologist)

Wilkinson next argues that the ALJ erred when he did not call a medical expert to consider

whether his combined psychiatric impairments met or medically equaled a listing. The

Commissioner contends that there was no need to summon a medical expert because the ALJ was

entitled to rely on the opinion of state agency medical consultants.

Whether a claimant's condition equals a listed impairment is "strictly a medical

determination" and "the focus must be on medical evidence." *Hickman v. Apfel*, 187 F.3d 683, 688

(7th Cir. 1999). Nevertheless, an ALJ's decision to call a medical expert is discretionary, 20 C.F.R.

§ 416.927(f)(2)(iii), and an ALJ may rely on state agency physicians' opinions to determine

disability. *Scott v. Sullivan,* 898 F.2d 519, 524 (7th Cir. 1990) (citing *Waite v. Bowen,* 819 F.2d

1356, 1360 (7th Cir. 1987)).

The Commissioner argues that "[h]ere, the ALJ based his medical equivalence decision [that Wilkinson did not meet a listing] on the medical opinions of the 'State Agency medical consultants who evaluated the issue at the initial and reconsideration levels of the administrative process and reached the same conclusion.'" Indeed, the ALJ would have been entitled to rely on the opinions of state agency medical consultants, but there is no indication that the ALJ did, in fact, do so. Furthermore, it appears that the ALJ *rejected* the opinions of the state agency medical consultants who opined that Wilkinson did meet Listing 12.09, but he did so without explanation. It does appear, then, that the ALJ's decision is based on his own layperson's opinion, and not on medical evidence. Accordingly, the ALJ's opinion must be reversed and remanded for reconsideration of the medical equivalence issue, based on a review of the medical evidence.

### C. Credibility Determination

In the event that Wilkinson's impairments do not meet or medically equal a listing, Wilkinson next argues that the ALJ's credibility determination is erroneous because the ALJ failed to consider Wilkinson's GAFs of 50 and below as they relate to the location, duration, frequency, and intensity of Wilkinson's pain and other symptoms.

An ALJ's assessment of the claimant's credibility is entitled to special deference and is not grounds for reversal and remand unless it is "patently wrong." *E.g.*, *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).[4] However, as explained more fully above, the ALJ properly considered

---

[4] Wilkinson further argues that the ALJ's decision is patently erroneous because it is perfunctory boilerplate and intentionally vague. While the ALJ recites a paragraph faulted by the Seventh Circuit as perfunctory, *Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011), the ALJ's decision in *Martinez* included "no explanation of which of Martinez's statements are not entirely credible or how credible or noncredible any of them are." This is simply not the case with this ALJ's decision. In several detailed and thorough paragraphs preceding and following this

Wilkinson's GAF scores and accorded them the evidentiary weight they were due, as he noted that they were mere "snapshots" of Wilkinson's impairment and viewed them in the context of the medical record.

However, the Court notes that, to the extent that it appears that the ALJ rejected medical consultant opinions as to the degree of Wilkinson's limitations, which opinions to some extent corroborate Wilkinson's subjective reports, the ALJ's credibility determination may not be supported by substantial evidence. That is, although the ALJ appropriately reviews the medical evidence of record and notes that "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," his review fails to account for contrary evidence that supports Wilkinson's allegations. Accordingly, remand for reconsideration regarding these opinions is appropriate.

---

"boilerplate" language, the ALJ highlights discrepancies between Wilkinson's testimony and the medical evidence that led to the ALJ's conclusion.

Finally, as is so often the case, the ALJ's credibility discussion begins with the finding that the claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms are not credible to the extent they are inconsistent with the ALJ's RFC assessment. The Seventh Circuit has repeatedly noted that this boilerplate backwardly implies that the ability to work is determined first and is then used to determine the claimant's credibility. *Shauger v. Astrue,* 675 F.3d 690, 696 (7th Cir. 2012) (quoting *Bjornson v. Astrue,* 671 F.3d 640, 645 (7th Cir. 2012) and citing *Parker v. Astrue,* 597 F.3d 920, 921-22 (7th Cir. 2010)). Credibility findings must have support in the record, and such hackneyed language seen universally in decisions adds nothing. *Shauger,* 675 F.3d at 694 (citing *Punzio v. Astrue,* 630 F.3d 704, 709 (7th Cir. 2011) and *Parker,* 597 F.3d at 921–22)).

14

## C.      Step 5 Determination

Finally, Wilkinson contends that the ALJ's determination that he was not disabled because he could perform some jobs is in error. The source of this error, Wilkinson argues, is the ALJ's residual functional capacity assessment, which is not supported by substantial evidence because it fails to account for Wilkinson's deficiencies in concentration, persistence, or pace. In support of his argument, Wilkinson analogizes this case to *Yost v. Astrue*, in which the decision of the Commissioner was reversed because the Court "simply [could] not know whether the ALJ sufficiently addressed the limitations of concentration, persistence and pace by instructing the VE to consider only simple, unskilled jobs." 2012 WL 2814373 at *20 (N.D. Ill. 2012). The Court expressed concern that focusing on the skill level of the work did not fully address the impact of mental limitations. *Id.* Here, however, to the extent that the ALJ found Wilkinson to have moderate restrictions in maintaining concentration, persistence, or pace, his RFC adequately reflects those limitations in way that distinguishes this case from *Yost.* Specifically, the ALJ did not simply limit Wilkinson to "unskilled work;" rather, he limited Wilkinson to "simple and repetitive tasks, requiring no independent judgment regarding work processes, with work goals that are static and predictable." R. at 18.

At the same time, to the extent that the ALJ's determination that Wilkinson suffers from "moderate" difficulties in maintaining concentration, persistence, or pace is at odds with the medical consultant's opinion that Wilkinson suffers from "marked" difficulties in this area, the ALJ's RFC may nevertheless not go far enough in accounting for Wilkinson's limitations. Accordingly, depending on the ALJ's assessment of those medical consultant opinions, modification of the RFC to reflect this assessment may be appropriate.

## VI. <u>CONCLUSION</u>

As set forth above, the ALJ failed to build an accurate and logical bridge from the evidence to his conclusion on the step three determination of whether Wilkinson's impairments met or medically equaled a listing. Furthermore, reconsideration of the claimant's credibility and his RFC may be appropriate in light of the analysis of the listings. The decision of the Commissioner is therefore **REVERSED AND REMANDED** for further proceedings consistent with this entry.

SO ORDERED:  07/22/2013

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification.

16